IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **VIRGINIA BARRERA** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION** |
| | § | **NO. 5:10-CV-665 XR** |
| | § | |
| **MTC, INC. d/b/a MI TIERRA CAFÉ** | § | |
| **AND BAKERY d/b/a LA MARGARITA** | § | |
| **RESTAURANT & OYSTER BAR, and** | § | |
| **d/b/a RESTAURANTE PICO DE GALLO** | § | |

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES DEFENDANT MTC, INC. (hereinafter referred to as "Defendant" and/or "MTC"), Defendant in the above-styled and numbered cause, and files, pursuant to FED. R. CIV. P. 56, this its Motion for Partial Summary Judgment (the "Motion") and moves this Court to grant judgment in its favor, for the reason there is no genuine issue of material fact, and Defendant therefore is entitled to judgment as a matter of law.  In support thereof, Defendant respectfully shows as follows:

### I.
### INTRODUCTION

Mi Tierra Café and Bakery ("Mi Tierra") is a restaurant owned and operated by La Familia Cortez, dating back to 1941, and is located in the Market Square (El Mercado).  It has grown from a three-table café to being able to seat over 500 patrons.  La Familia Cortez is proud of the fact that many of its employees have worked for MTC for more than thirty (30) years, including nine (9) employees who have worked for MTC between 31 and 40 years.  Mi Tierra's

mission is to provide the highest quality food, authentic culture, sincere hospitality and community patronage.

Plaintiff Virginia Barrera ("Plaintiff") and the opt-in Plaintiffs argue that Mi Tierra's tip pool is invalid under the Fair Labor Standards Act ("FLSA" or the "Act") because it requires servers to share their tips with "non-service bartenders," who do not customarily and regularly receive tips directly from customers. (Pl.'s First Am. Comp., ¶12) (Dkt. No. 23). Plaintiff also alleges that Mi Tierra occasionally shares tips with cooks and/or kitchen workers. (Pl.'s First Am. Comp. ¶12). Because Mi Tierra employs service bartenders who enhance customer service in the front of the house and are visible to customers, they are properly included in the tip pool. Furthermore, Mi Tierra only shares service charges from large, private events with individuals involved in setting up and/or serving at these events; it does not distribute tip pool funds to anyone other than service bartenders, hosts, bakery counter clerks or assistant servers/bussers. Although Plaintiff has not specifically challenged the tip pool participation of the hosts, bakery counter clerks or the assistant servers/bussers, it will be shown that Mi Tierra properly includes these positions in its tip pool.

On May 5, 2011, Plaintiff filed her Motion for Partial Summary Judgment. (Dkt. No. 40). Plaintiff argued that Mi Tierra's tip pool is invalid under the FLSA because it requires servers to share their tips with "non-service bartenders," who do not customarily and regularly receive tips directly from customers. (Dkt. No. 40). After considering the Parties' briefing, on July 29, 2011, the Court denied Plaintiff's Motion, holding that there was a question of fact regarding whether Mi Tierra's service bartenders could reasonably be considered "customarily and regularly" tipped, even though their direct customer interaction is slight, which precluded summary judgment. *Barrera v. MTC, Inc. d/b/a Mi Tierra Café and Bakery d/b/a La Margarita*

2

*Restaurant & Oyster Bar, and d/b/a Restaurante Pico De Gallo*, Civ. A. No. SA-10-CA-665-XR, 2011 U.S. Dist. LEXIS 83468, *19 (W.D. Tex. July 29, 2011) (Dkt. No. 49).

In denying Plaintiff's Motion, the Court acknowledged that "front-of-the-house" employees often share in tip pools based on the legislative history of the FLSA. *Id.* at *7. The Court assumed that employees who "are visible to and interact with the public also are likely to make greater contributions to customer service" based on other federal courts' holdings. *Id.* at *9-*10. It inferred from the Senate Report that the "distinguishing criterion between tipped employees and non-tipped employees is the degree of customer service that influences tips – be it visible or direct." *Id.* at *10.

The Court determined that direct customer interaction is not required, but is merely a common trait among many employees who are "customarily and regularly" tipped. *Id.* at *12. It also restricted the nexus necessary for tip pool inclusion to those employees who directly interact with customers or visibly engage in customer service. *Id.* at *13-*14. However, "the degree of visibility must pass a threshold that incentivizes the average customer to 'customarily and regularly' tip 'in recognition' of the service being performed to their benefit," and the Court requires a fact intensive inquiry of the actual duties performed by the particular employee in question. *Id.* at *14. Notably, the Court focused on the fact that busboys are validly included in tip pools, even though they rarely interact with customers directly, because they perform duties visible to the customers. *Id.* at *18, *26.

Because Mi Tierra's service bartenders perform their bartending duties in the dining rooms of the restaurant in front of patrons, thus enhancing their dining experience, their inclusion as recipients of the tip pool is proper as a matter of law, and Mi Tierra is entitled to summary judgment on its position that the tip pool is proper and valid for all participants.

## II.
## STATEMENT OF FACTS

**A.**   **Mi Tierra's Tip Pool or Tip Sharing and Private Parties.**

Plaintiff and the opt-in Plaintiffs ("Plaintiffs") currently work or have worked as servers at Mi Tierra.   Servers at Mi Tierra currently contribute two percent (2%) of gross sales (excluding tax and to-go orders) to a tip pool.  (Affidavit of George P. Cortez, a true and correct copy of which is attached hereto and incorporated by reference as Exhibit A, ¶4).  The tip pool is currently distributed to assistant servers/bussers, service bartenders, hosts and bakery counter servers.  (Ex. A, ¶5).  Mi Tierra has never distributed these funds to "cooks and/or other kitchen workers." (Ex. A, ¶6).

When Mi Tierra hosts a private event for a large number of guests, it charges a compulsory service charge of 18%.  (Deposition of George P. Cortez, true and correct excerpted portions of which are attached hereto and incorporated by reference as Exhibit B, at 21-22).  This service charge is distributed to the waitstaff assigned to the private function.  (Ex. B at 23).  "There may be some occasions where [Mi Tierra has] a group of... 100, 150, 200 [guests], [and Mi Tierra] may take 40 or $50 [of the service charge] and give it to... some other staff members that helped in setting up the party or that sort of thing."  (Ex. B at 23-24).  Large parties of 100 to 200 people at Mi Tierra occur on average ten (10) times per year.[1]  (Ex. A, ¶7).

**B.**   **Mi Tierra's Assistant Servers/Bussers.**

The assistant servers/bussers occasionally receive tips directly from customers.  (Ex. B at 10).  The starting cash wage for an assistant server/busser is approximately $5.50, and Mi Tierra takes a small tip credit on these individuals.  (Ex. B at 55).  Some assistant servers/bussers earn a cash wage of more than the applicable minimum wage.   (Ex. B at 55).   An assistant

---

[1] Upon reflection, Mr. Cortez determined that Mi Tierra hosts approximately ten (10) large, private events per year rather than four to five.  *See* Ex. B at 24.

server/busser's primary duties include cleaning tables as quickly as possible, resetting each table with silverware, tostadas and salsa, refilling drinks at the table for guests and helping other co-workers with their duties. (A true and correct copy of relevant portions of the server assistant training guide is attached hereto and incorporated by reference as Exhibit C; Affidavit of Maria Tijerina, a true and correct copy of which is attached hereto and incorporated by reference as Exhibit D (authenticating affidavit)).[2]

## C.    Mi Tierra's Hosts/Hostesses & Bakery Counter Servers.

Mi Tierra often uses hosts/hostesses and bakery counter servers interchangeably because the host stands and the bakery counter are in the waiting area of the restaurant. (A true and correct copy of photographs depicting the waiting area with the bakery counter at Mi Tierra is attached hereto and incorporated by reference as Exhibit E; *see also* Ex. A, ¶14 (also the authenticating affidavit for photographs of restaurant and floor map)[3]; a true and correct copy of the restaurant floor map is attached hereto and incorporated by reference as Exhibit A1 (depicting, among other things, the location of the bakery counter and host stands in the waiting area)). On both ends of the waiting area, there are entrances to the restaurant from the outside. (Ex. A, ¶14). The hosts and bakery counter servers receive tips directly from customers (Ex. B at 10) and from the tip pool, and records demonstrate that bakery counter servers customarily and regularly receive more than $30 per month in tips directly from customers. (True and correct copies of a sample of bakery counter servers' payroll records reflecting credit card tips earned in 2008 and 2009 are attached hereto and incorporated by reference as Exhibit F; *see also* Ex. D (authenticating records)). However, Mi Tierra discourages hosts/hostesses from taking tips so as

---

[2] This Affidavit also authenticates Exhibits C, F, G & H and is incorporated herein by reference with respect to each of these exhibits.
[3] This Affidavit also authenticates Exhibits I and J (photographs of Mi Tierra) and is incorporated herein by reference with respect to Exhibits I and J.

to ensure that the waitlist is not compromised by tips to the hosts/hostesses.  (Ex. A, ¶15).  Some

of the hosts and bakery counter servers earn a cash wage of more than the applicable minimum

wage, and Mi Tierra does not take a tip credit for these individuals, but they do receive tips from

the tip pool.  (Ex A, ¶16; Ex. B at 55).

During high volume periods, such as Spring Break or the week of Fiesta, Mi Tierra can

experience wait times for tables as long as one and a half to two and a half hours.  (Ex. A, ¶17).

The hosts/hostesses work to enhance the wait period by informing customers about the wait and

options for enjoying the wait by visiting the Mariachi Bar, purchasing bakery goods or visiting

the Market Square (El Mercado)[4] or Museo Alameda.[5]  (Ex. A, ¶17).  The bakery counter servers

enhance the waiting patrons by selling baked goods or beverages directly to the customers while

they wait for a table.  (Ex. A, ¶17).

The primary duties of the host/hostess position include greeting each guest, seating the

guests with menus, arranging tables for guests, performing table checks and helping co-workers

with their duties.  (A true and correct copy of relevant portions of the host training guide is

attached hereto and incorporated by reference as Exhibit G; *see also* Ex. D (authenticating

exhibit)).  Hosts are also expected to refill drinks for guests and bus tables when needed.  (Ex. G

at 8).  Bakery counter servers' job duties include directly greeting guests, waiting on and serving

---

[4] A description by the City of San Antonio describes Market Square as the following:
> The rich culture of San Antonio abounds throughout the plazas of Market Square.  A three-block outdoor plaza lined with restaurants, shops and produce stands near San Antonio's city center, Market Square is the largest Mexican market in the U.S.  It is one of America's top ten outdoor markets according to Frommer's.  Dozens of shops sell everything from hand-embroidered dresses to leather belts.  Market Square's working artists, musicians, dancers and major cultural events give it a rich and lively cultural atmosphere.  Visitors browse through 32 shops at "El Mercado," and 80 specialty shops in the Farmers Market Plaza.  Market Square is also the scene of many Hispanic festivals where food and beverage booths spring up alongside Guadalajara lamps while the sounds of mariachi music blends with the excitement of Mexican dances.

Visit San Antonio.com, http://www.visitsanantonio.com/visitors/play/attraction-details/index.aspx?id=2010 (last visited August 24, 2011).
[5] Museo Alameda, located in the historic Market Square, opened as the first formal affiliate of the Smithsonian Institution focusing on Latino art.  More information about the museum is available at http://www.thealameda.org.

3448528.10

guests with bakery items from the bakery counter (located in the waiting area) and helping co-workers with other duties. (A true and correct copy of relevant portions of the bakery server guide is attached hereto and incorporated by reference as Exhibit H; *see also* Ex. D (authenticating exhibit)).

## D.   Mi Tierra's Service Bartenders.

The two bars located within the restaurant's dining rooms are dedicated to preparing drinks for servers. (Ex. A, ¶8; Ex. A1 (depicting the location of the service bars in the mural room and the patio room)). Accordingly, Mi Tierra classifies its bartenders as "service bartenders." (Ex. A, ¶8). These service bars are distinguished from the Mariachi Bar, which is located across the waiting area to the restaurant and from which customers may purchase drinks directly from the bartenders.[6] (Ex. A, ¶10). Unlike the bartenders at the Mariachi Bar, the service bartenders do not (to MTC's knowledge) receive tips directly from customers. (Ex. B at 14-16, 40; Ex. A, ¶10).

Mi Tierra has established the service bars so that customers seated within the restaurant place drink orders through the servers, thereby preventing customers at the bar from competing with the servers ordering drinks for seated customers from the bartenders. (Ex. A, ¶11). The use of the service bars located in the dining rooms on both sides of the restaurant enhances the dining experience for both types of customers – those seated at the tables and being served by a server and those at the Mariachi Bar ordering drinks directly from the bartenders. (Ex. A, ¶12; true and correct copies of photographs of the Mariachi Bar attached hereto and incorporated by reference as Exhibit I). Service bartenders are not placed in the difficult position of having to choose between preparing drinks for a server (who then serves the drinks to a seated customer and

---

[6] The Mariachi Bar does not prepare drinks for patrons seated in the restaurant, and the exceptions to this rule are limited, such as a request for a special brand of tequila or the service bar is out of a particular beer or liquor. (Ex. A, ¶10).

receives a tip based on the total dining experience) or a customer standing at the bar (who would, then, tip the bartender directly based upon his/her interaction with the bartender). (Ex. A, ¶12). As contrasted with the service bars, and as depicted in Exhibit I, a long line of customers waiting to be served by bartenders may form at the Mariachi Bar, where servers for the tables in the Mariachi Bar are also ordering drinks from the bartenders. (*See* Ex. I). Mi Tierra uses service bartenders to avoid situations (like those depicted in Exhibit I) that would place customers and servers in competition for the attention of the service bartenders and to expedite service of beverages to the seated patrons in the dining rooms. (Ex. A, ¶12). As is, the service bartenders focus on preparing drinks for the servers, who then take the drinks directly to the seated patrons who tip the servers directly. (Ex. A, ¶13). The goal of Mi Tierra's service bartenders is to efficiently prepare drinks for seated patrons and thus enhance customer service to these patrons. (Ex. A, ¶13).

The service bars are located in the dining rooms in view of customers, and drinks are prepared there for direct delivery to customers by servers; as a result, Mi Tierra classifies the service bartenders as "front-of-the-house" employees. (Ex. A, ¶9; true and correct photographs of the service bartender stations at Mi Tierra are attached hereto and incorporated by reference as Exhibit J; true and correct copies of screenshots from Mi Tierra's website are attached hereto and incorporated by reference as Exhibit K;[7] *see also* Ex. A1 (depicting location of service bars inside dining rooms in the Mural Room and the Patio). Notably, Mi Tierra uses pictures of its elaborately    decorated    service    bars    to    market    its    banquet    rooms    on    its    website

---

[7] *See* Affidavit of Brad Parscale of Parscale Media, a true and correct copy of which is attached hereto and incorporated by reference as Exhibit L (authenticating affidavit for photographs from Mi Tierra's website). The screenshots depict the service bars and the Mariachi Bar. *See* Ex. K. The Mariachi Bar has stools for patrons to sit at the bar. *See* Ex. K.

(http://www.mitierracafe.com/gallery.html)).[8]    As depicted in Exhibits J and K, the ornate service bars at which the service bartenders prepare drinks are festively decorated for customers' enjoyment, openly and very publicly displaying the many choices available to customers who may consider an alcoholic beverage.[9]    (*See* Ex. J; Ex. K).

As an industry, restaurants employ bartenders (who prepare drinks for and serve drinks directly to customers), service bartenders (who prepare drinks for service to customers by a server/waiter) or a combination of both.   Regardless of the dispute regarding the correct label to be given to the bartenders at Mi Tierra's service bars, there is no dispute between Mi Tierra and Plaintiff regarding the duties performed by Mi Tierra's service bartenders, as even Plaintiff acknowledges that the bartenders included within the tip pool and made the basis of Plaintiff's lawsuit do not typically interact with or serve the customers directly and prepare drinks for servers.   (Pl.'s Mot. Summ. J. at 6) (Dkt. No. 40).[10]

### III.
### STANDARD AND BURDEN OF PROOF

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is  no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

[8] The pictures of the service bars have been on Mi Tierra's website prior to the filing of this lawsuit.  *See* Ex. L at 2.

[9] Occasionally, customers will go directly to a service bartender for a refill of a beverage such as water or milk for a child.  (*See* Ex. J at 10-12; Ex. B at 16).

[10] Plaintiff argues that Mi Tierra actually employs "non-service bartenders" who cannot be included within a tip pool because they do not receive tips from, nor have direct interaction in serving drinks directly to Mi Tierra's customers. *See id.*  Such term finds no use or support in either restaurant industry publications or relevant authorities, which is apparent when one reviews the authorities cited by Plaintiff in her Motion for Partial Summary Judgment (which fail, with the exception of one case interpreting Kansas law, to use that term).  *See Barrera*, 2011 U.S. Dist. LEXIS 83468, *14 n.22 (agreeing with Mi Tierra that "non-service bartender" is not a widely used term but determining that the focus of the *Elkins* court's holding was that bartenders' "'functions [were] performed *away* from the customers similar to that of a nontipped cook'").

of law." *Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).   A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.   *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) ("The existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 902 (5th Cir. 2000).

The court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Crawford,* 234 F.3d at 902. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000) (quoting *Anderson,* 477 U.S. at 250-51).   The employer bears the burden of proving the validity of a tip pool, and the relevant FLSA provisions are strictly construed in favor of the employee.   *See, e.g., Reich v. Priba Corp.,* 890 F. Supp. 586, 595-96 (N.D. Tex. 1995) (citing *Barcellona v. Tiffany English Pub, Inc.,* 597 F.2d 464, 467 (5th Cir. 1979)).

## IV.
## THE STATUTORY FRAMEWORK OF THE FLSA

### A.    The FLSA's Purpose.

Congress enacted the FLSA, 29 U.S.C. §§ 201-219, in 1938 in order to establish a federal minimum wage and require employers to pay overtime to certain eligible employees.   The Act did not include any reference to tips until 1966, when Congress amended Subsection 203(m) to allow employers to claim a "credit" equal to fifty percent (50%) of the minimum wage amount due to "tipped employees."   Sept. 23, 1966 Pub. L. 89-601, Title I, § 101(a), 80 Stat. 830.   The same law also added Subsection 203(t) to define a "tipped employee."   *Id.*

10

Eight years later, in 1974, Congress addressed tip pooling for the first time, adding to Subsection 203(m) that a "tipped employee" must retain all tips received by the employee "except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips." Apr. 8, 1974, Pub. L. 93-259, Title II, § 13(e), 88 Stat. 64.

**B.      "Tipped Employees" and the "Tip Credit."**

Food servers must receive at least the applicable minimum wage. 29 U.S.C. § 206(a)(1). Because food servers are "tipped employees," however, their tips may be combined with the hourly cash wage paid directly by the employer, allowing restaurants to pay a "sub-minimum wage." WH Admin. Op. – 468 (Sept. 5, 1978) ("Waitresses"); 29 U.S.C. §§ 230(m), (t). The difference between the minimum wage and the amount an employee must be paid directly by the employer is commonly referred to as the "tip credit." *See* 29 U.S.C. § 203(m), 29 C.F.R. § 531.59. The employer may only take a tip credit for "hours worked by [an] employee in an occupation in which [s]he qualifies as a 'tipped employee.'" 29 C.F.R. § 531.59.

**C.      Tips, Tip Pooling/Tip Sharing and Front-of-the-House Employees.**

With the amendment of Subsection 203(m) to address tip pooling in 1974, Congress expressly permitted pooling of tips among "employees who customarily and regularly receive tips." 29 U.S.C. § 203(m). The Code of Federal Regulations define "tip" as a "sum of money presented by a customer as a gift or gratuity in recognition of some service provided to him." 29 C.F.R. §531.52 (2011). The DOL Handbook mirrors the 1974 legislative history on the FLSA amendments and explains that certain occupations have been recognized as employees who "customarily and regularly receive tips: (1) waiters/waitresses; (2) bellhops; (3) counter personnel who serve customers; (4) busboys/girls (server helpers); [and] service bartenders."

11

S. Rep. 93-690, at 43 (Feb. 22, 1974) (A true and correct copy of relevant portions of the Senate Report are attached hereto and incorporated by reference as Exhibit M); U.S. Department of Labor Field Operations Handbook ("DOL Handbook") § 30d04(a) (*available at*: http://www.dol.gov/whd/FOH/FOH_Ch30.pdf) ("It is not required that all employees who share in tips must themselves receive tips from customers.").[11]   The DOL Handbook likewise adds that tipped employees may *not* be required to share tips "with employees who have not customarily and regularly participated in tip pooling arrangements," noting that the following "employee occupations" would not be eligible to participate: "(1) Janitors; (2) Dishwashers; (3) Chefs or cooks; [and] (4) Laundry room attendants." *Id.* § 30d04(c). The Code of Federal Regulations, however, names only a "busboy" to explain who is validly included in a tip pool.   29 C.F.R. § 531.54 (2011); *Barrera*, 2011 U.S. Dist. LEXIS 83468, *6.

The DOL Handbook specifically indicates that "[i]t is not required that all employees who share in tips must themselves receive tips from customers." DOL Handbook § 30d04(a).   A 1997 DOL Opinion Letter states that "[i]t is customary for waiters/waitresses to receive gratuities and share them with the busboys/busgirls who assist in serving the patrons." DOL Opinion Letter, 1997 WL 998047 (Nov. 4, 1997).   The DOL Handbook's list of positions included in tip pools is not meant to be exhaustive.   *See* DOL Handbook § 30d04(a).   To the contrary, as businesses evolve, new positions are recognized as eligible for tip pools. *See Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 301 (6th Cir. 1998) (hosts); *Dole v. Continental Cuisine, Inc.*, 751 F. Supp. 799 (E.D. Ark. 1991) (maitre d').

---

[11] While not binding on this Court, the DOL Handbook is a persuasive authority.   *Myers v. The Copper Cellar Corp.*, 192 F.3d 546, 554 (6th Cir. 1999).

**D.**     <u>A Compulsory Service Charge is Not Part of Server's Tip Income.</u>

It is clear that a compulsory charge for service, such as eighteen percent (18%) of the amount of the bill, imposed on a customer by an employer's establishment, is not a "tip" and may be distributed to employees to be used to satisfy the monetary requirements of the FLSA. 29 C.F.R. § 531.55(b). According to the DOL Handbook, "the employer has the complete discretion in choosing the manner in which the compulsory service charge is used, which would include using it to pay servers and/or server helpers (busboys/busgirls)." DOL Handbook § 30d03.

**E.**     <u>Direct Customer Interaction and Visible Service to Customers May Lend Support to Valid Participation in Tip Pool.</u>

As Plaintiff pointed out in her Motion for Partial Summary Judgment (Dkt. No. 40), some courts have held that customer interaction is highly relevant to the question of whether an employee may participate in a valid tip pool. *See, e.g., Myers*, 192 F.3d at 546, 550[12] (finding that salad preparers were improperly included in the tip pool); *Kilgore*, 160 F.3d at 294, 301 (finding that hosts were properly included in tip pool); *Pedigo v. Austin Rumba, Inc.*, 722 F. Supp.2d 714 (W.D. Tex. 2010) (finding that dishwashers and preparation cooks were improperly included in tip pool); *Dole*, 751 F. Supp. at 799 (finding a maitre d' eligible to participate in a tip pool); *Roussell v. Brinkler Int'l, Inc.*, Civ. A. H-053733, 2008 U.S. Dist. LEXIS 52568 (S.D. Tex. July 9, 2008) (finding a genuine issue of fact as to whether Quality Assurance ("QAs") employees were eligible to participate in a mandatory tip pool). Defendant does not dispute that salad preparers, dishwashers and preparation cooks are back-of-the-house employees who should not be included in a tip pool, and legislative history and the DOL Handbook support the courts' findings. *See* S. Rep. 93-690 at 43; *see also* DOL Handbook

---

[12] Notably, *Myers* involved a tip pool that included service bartenders. *See Myers*, 192 F.3d at 548. The inclusion of the service bartenders in the defendant's tip pool was not challenged.

Ch. 30, § 30d04(a) (Dec. 9, 1988) (echoing the Senate Report and noting that dishwashers, chefs and cooks are examples of employees who are not eligible to participate in tip pooling arrangements). At least one district court, however, has refused to consider the amount of direct customer interaction as dispositive. *See Lentz v. Spanky's Restaurant II, Inc.*, 491 F. Supp.2d 663, 670-71 (N.D. Tex 2007) (when evaluating the expediter position's participation in a tip pool, the court noted that "[n]othing in the statute specifically requires that an employee who shares in a tip pool interact directly with customers" and analyzed the busboy position in comparison). *Barrera*, 2011 U.S. Dist. LEXIS 83468, *7, *11, *16.

The FLSA regulations specifically provide that busboys who have little to no customer interaction are among the employees who customarily and regularly receive tips and, thus, may be included in a mandatory tip pool. 29 C.F.R. §531.54. In *Lentz*, (491 F. Supp.2d at 663), the court considered the question of whether expediters could be in a tip pool even though they had little customer interaction. The court observed:

> Plaintiff's main contention seems to be that no service personnel other than waiters and busboys may share in a tip pool and that expediters do not have enough direct contact with customers to allow for sharing in the tip pool…. Nor does a busboy normally directly receive tips from customers or directly interact with them; yet, busboys are still considered as employees who customarily and regularly receive tips.

*Id.* at 670-71. Citing 29 U.S.C. § 203(m), the court further observed, "[n]othing in the statute specifically requires that an employee who shares in a tip pool interact directly with customers." *Id.* at 671 n.5. Nor can such requirement be read into the statute, as the legislative history makes clear. *See* Ex. H at 43 (employees who contribute to customer service (as opposed to directly provide), like "waiters, bellhops, waitresses, countermen, busboys, and service bartenders, etc." are properly included in a tip pool).

14

Further, the DOL has stated that a barback may participate in a tip pool when:

> ...the term "barback" refers to a bartender's assistant who learns the profession of bartending under the tutelage of a bartender and whose primary job duty is to support the bartender. The barback typically works the same hours as the bartender and is responsible for restocking the bar and ensuring that the bar area remains clean and organized... [and] the barback may also bus the service counter, clean empty glasses sitting on the bar, take out the trash from behind the bar and clean the floor of the bar area... [and] the barback works primarily in the bar area, in front of and around customers, and has the opportunity to occasionally interact with customers.

*See* DOL Opinion Letter FLSA 2009-12 (Jan. 15, 2009).[13]  There, the barbacks did not directly receive tips from customers, but from the bartenders they supported.  The tips were more than $30 per month.  Because the barbacks were "engaged in an occupation in which [they] customarily and regularly [received] more than $30 a month in tips," they qualified as "tipped employees." *Id.*

Obviously, if the Department of Labor has found that a barback with limited or no customer interaction can participate in a tip pool, it must be found that Mi Tierra's service bartenders may also participate in the tip pool, as the extent of their customer interaction and performance of duties in front of customers is quite similar.  Nowhere in the FLSA, its legislative history or the Department of Labor's interpreting regulations is there a requirement that employees have direct customer interaction in order to be considered to have customarily and regularly received tips.  In considering positions that were not clearly recognized by Congress

---

[13] Opinion letters, which are issued without the formal notice and rulemaking procedures of the Administrative Procedure Act, do not receive the same kind of *Chevron* [*U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984)] deference as do administrative regulations.  *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 524-25 (5th Cir. 1999).  Absent ambiguity, "[i]nterpretations contained in formats such as opinion letters are 'entitled to respect' under [the Supreme Court's] decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1994), but only to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore*, 323 U.S. at 140); *Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 497 (5th Cir. 2003).  Thus, "[i]nterpretive and opinion letters by the Department of Labor do not per se bind the court.  Such materials, however, do 'constitute a body of experienced and informed judgment' and the court will give these materials 'substantial weight.'" *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 638 (5th Cir. 2001) (citation omitted).

and the Department of Labor as being properly included within a tip pool, various courts have considered an employee's contact with customers as being a factor in determining whether they could be considered to customarily and regularly receive tips, though not dispositive.  More important, in light of this Court's prior ruling, is whether the employee's duties are an "integral part of customer service" and performed in a manner visible to customers such that the customers would be incentivized to "'customarily and regularly' tip 'in recognition' of her services." *Barrera*, 2011 U.S. Dist. LEXIS 83468, at *11.

Because Mi Tierra's service bartenders, hosts/hostesses, bakery counter clerks and assistant servers/bussers all perform duties that are integral to customer service and in plain sight of the patrons, it follows that customers are incentivized to customarily and regularly tip these employees for their services, and such employees should be found to be "tipped employees" within the meaning of the FLSA.

**F.**      **Industry Custom May Also Lend Support to Valid Participation in a Tip Pool.**

This Court has held that industry custom may lend support to an argument that an employee is properly included in a tip pool. *Barrera*, 2011 U.S. Dist. LEXIS 83468, at *9.  In addition, the DOL Handbook explains that employers should look to "the practices regarding their sharing of tips in the locality and type of establishment involved" when considering whether employees are tip-pool eligible.   DOL Handbook § 30d04(d).   As an industry, restaurants employ bartenders (who prepare drinks for and serve drinks directly to customers), service bartenders (who prepare drinks for service to customers by a server/waiter) or a combination of both.   MTC recognizes that simply referring to its bartenders as "service bartenders" does not automatically qualify them for valid tip pool participation.   Rather, MTC

16

relies upon the industry's understanding and use of the term "service bartenders" to refer to those who, like those employed by MTC, prepare drinks for servers for delivery to seated customers.

The understanding that service bartenders are those bartenders who do not directly serve customers is also reflected in various restaurant industry publications. *See, e.g.*, COSTAS KATSIGRIS & MARY POTTER, THE BAR AND BEVERAGE BOOK 44 (2d ed. 1991) (stating that a service bar "does not serve customers directly but deals only with filling drink orders brought by waiters and waitresses" and that it is "sometimes... a part of the dining room, but more often it is out of sight") (A true and correct copy of relevant portions is attached hereto and incorporated by reference as Exhibit N); LENDAL H. KOTSCHEVER & MARY L. TANKE, MANAGING BAR AND BEVERAGE OPERATIONS 97 (1991) (stating that a service bar is "usually not directly visible to your guests," but noting that there are "many combinations of front and service bars") (A true and correct copy of relevant portions is attached hereto and incorporated by reference as Exhibit O); WALLACE RANDE & LUCIANI VALENTINO, THE BEVERAGE SERVICE WORLD 37 (2001) ("The majority of service bars are not in the direct view of the customer and are not designed to be accessed by customers") (A true and correct copy of relevant portions is attached hereto and incorporated by reference as Exhibit P); PETER E. VAN KLEEK, BEVERAGE MANAGEMENT AND BARTENDING 89 (1981) ("[The service bar] is a behind-the-scenes operation, and there is no contact between the customer and the bartender. It is generally used to service dining room patrons, with waitresses and waiters placing the orders at the service bar and serving the guests.") (A true and correct copy of relevant portions is attached hereto and incorporated by reference as Exhibit Q). Mi Tierra agrees with the Court that these industry sources differ with respect to the location of the service bars, *see Barrera*, 2011 U.S. Dist. LEXIS 83468, at *10

17

n.17, but one fact is clear from all of these publications:  service bars prepare drinks for servers for distribution to customers, not for customers directly.

Contrary to the opinion in *Elkins v. Showcase, Inc.*,[14] additional authorities support the understanding that a service bartender fills drink orders from servers, who then deliver the drinks to customers, and has "no direct contact with the public."  *See, e.g., Krause v. C.I.R.,* T.C. Memo 1992-270, 1992 WL 95627 (U.S. Tax. Ct. 1992) ("A service bartender works behind the bar in the game or slot machine area and fills orders taken by the cocktail servers, but has no direct contact with the public."); *see also Louie v. McCormick & Schmick Restaurant Corp.,* 460 F. Supp.2d 1153, 1164 (C.D. Cal. 2006) (finding under California state law that restaurants may "require servers to share tips with non-managerial employees such as bartenders who routinely contribute to the service of patrons, whether or not such employees provide any service, direct or indirect, to a particular server's customers.").  Finally, though not dispositive in this proceeding, it is worth noting that at least one state's laws recognize what it means within the industry to be a service bartender by defining "service bartender" as "a person who prepares alcoholic or nonalcoholic beverages for patrons to be served by another employee, such as a wait staff employee." Mass. Gen. Laws, ch. 149, § 152A(a) (2010).

V.
### MI TIERRA'S TIP POOL IS VALID AS A MATTER OF LAW

A.    <u>Mi Tierra Has Properly Distributed Tip Pool Funds.</u>

Although Mi Tierra is permitted to distribute the compulsory service charge from large private functions to employees at its discretion, it distributes the vast majority of this money to

---

[14] The Kansas Supreme Court invented the position of "non-service bartender" in *Elkins v. Showcase, Inc.,* 704 P.2d 977, 980 (Kan. 1985).  Without citing any authority supporting the existence of such a position, the court simply assumed that bartenders who made drinks in the back were "non-service bartenders." *See id.* at 735. The court then incorrectly assumed that when a bartender's "functions are performed away from the customers," the bartender is a "non-service bartender" who could not participate in a tip pool. *Id.; see also Barrera,* 2011 U.S. Dist. LEXIS 83468, *14 n.22.

the waitstaff assigned to the function; on rare occasions, Mi Tierra will distribute some of the service charge to employees who helped set up and serve the event.  Pursuant to 29 C.F.R. § 531.55(b), Mi Tierra – on those rare occasions – has legally distributed portions of a compulsory service charge from these events to employees other than waitstaff.  (*See supra* at 4). Mi Tierra has never distributed tip pool funds to employees other than the assistant servers/bussers, hosts, service bartenders and bakery counter clerks (*see supra* at 4), and Plaintiff and other deposed opt-in Plaintiffs have no evidence to support such an allegation.  (*See* Deposition of Virginia Barrera at 54-55, 73-74, excerpted portions of which are attached hereto and incorporated by reference as Exhibit R; Deposition of John Saldana at 50-53, excerpted portions of which are attached hereto and incorporated by reference as Exhibit S; Deposition of Jeffrey Barrientes at 79-81, excerpted portions of which are attached hereto and incorporated by reference as Exhibit T; Deposition of Mauro San Miguel at 54-56, excerpted portions of which are attached hereto and incorporated by reference as Exhibit U; Deposition of Miguel Salazar at 65-68, excerpted portions of which are attached hereto and incorporated by reference as Exhibit V; Deposition of Joel Lopez at 65-66, excerpted portions of which are attached hereto and incorporated by reference as Exhibit W; Deposition of Jonathan Rodriguez at 71-74, excerpted portions of which are attached hereto and incorporated by reference as Exhibit X; Deposition of Vanessa Barrera at 83-84, excerpted portions of which are attached hereto and incorporated by reference as Exhibit Y).  As a result, Mi Tierra respectfully requests that the Court grant summary judgment in favor of Mi Tierra on the issue of whether these compulsory service charges (erroneously referenced in Plaintiff's Complaint as tip pool funds) were improperly distributed to "cooks and/or kitchen workers" on occasion.  (*See* Pl.'s First Am. Complaint ¶12).

19

**B.**    **Mi Tierra's Assistant Servers/Bussers are Properly Included in the Tip Pool.**

The FLSA's legislative history and the DOL Handbook specifically state that "busboys/girls (server helpers)" have been recognized as "customarily and regularly receiv[ing] tips." *See* Ex. H at 43; DOL Handbook § 30d04(a); 29 C.F.R. §531.54 (explicitly validating the inclusion of busboys in tip pools).[15]    It is undisputed that Mi Tierra's assistant servers/bussers perform the functions of a traditional busboy/girl: cleaning tables as quickly as possible, resetting each table with silverware, tostadas and salsa, refilling drinks at the table for guests and helping other co-workers with their duties.    (*See supra* at 4-5).    Because Plaintiff alleges simply that distribution of the tip pool funds to all of those who receive such funds is improper, it is unclear whether she challenges distribution of such funds to any position other than service bartenders. Because it is clear from the facts and supporting law that all such positions are properly included, however, and to the extent that Plaintiff alleges that inclusion of such positions within the tip pool are improper, Mi Tierra is entitled to a finding of such as a matter of law and respectfully requests the Court grant summary judgment on this issue.

**C.**    **Mi Tierra's Hosts/Hostesses and Bakery Clerks are Properly Included in the Tip Pool.**

Mi Tierra often uses hosts/hostesses and bakery counter servers interchangeably because the host stands and the bakery counter are both located in the guest waiting area.  (*See supra* at 5).    The bakery counter servers receive tips directly from customers, and bakery counter servers customarily and regularly receive more than $30 month in tips directly from customers.[16] (*See supra* at 5).  Hosts are discouraged from taking tips, because Mi Tierra does not want to compromise its waitlist.  (*See supra* at 5).    During high volume periods, Mi Tierra can

---

[15] Plaintiff has not specifically challenged the inclusion of assistant servers/bussers in Mi Tierra's tip pool.
[16] Plaintiff has not specifically challenged the inclusion of hosts/hostess or bakery counter clerks in Mi Tierra's tip pool.

experience wait times for tables as long as one and a half to two and a half hours.  (*See supra* at 6).   The hosts/hostesses of Mi Tierra work to enhance the wait period for customers by informing them about the wait and options for enjoying the wait by visiting the Mariachi Bar, purchasing bakery goods or visiting the Market Square (El Mercado) or Museo Alameda, and the bakery counter servers do the same by selling baked good directly to the customers while they wait for a table.  (*See supra* at 6).   Bakery counter servers are expected to directly greet guests, serve guests with bakery items and help co-workers.  (*See supra* at 6).   All of these job duties are conducted in plain sight of customers and are performed to enhance customer service, especially during long waiting periods for tables.

As previously discussed, the primary duties of the hosts/hostesses include greeting each guest, seating the guests with menus, arranging tables for guests, performing table checks and helping co-workers with their duties.  (*See supra* at 6).   Mi Tierra's hosts/hostesses are also expected to refill drinks for guests and bus tables when needed.  (*See supra* at 6).    In *Kilgore*, the court held that hosts were "tipped employees," reasoning that hosts "receive tips from tip outs by servers" and "perform important customer service functions." *Kilgore*, 160 F.3d at 301.  The court noted that the important customer service functions included greeting customers, supplying them with menus, seating them at tables and enhancing the wait. *Id.* at 301.  Having determined that the hosts were "tipped employees," they necessarily were allowed to participate in the tip pool. *Id.* at 301-02.  Like the hosts in *Kilgore*, the hosts/hostesses of Mi Tierra receive tips from the servers and perform important customer service functions. *See Kilgore*, 160 F.3d at 301-02. Thus, Mi Tierra's hosts/hostesses are properly included in the tip pool as a matter of law.

Regarding the bakery counter servers' participation in the tip pool, the FLSA's legislative history and the DOL Handbook specifically state that "counter personnel who serve customers" is an occupation that has been recognized as "customarily and regularly receiv[ing] tips" and thus eligible to participate in a tip pool.  Ex. H at 43; DOL Handbook § 30d04(a).  Without a doubt, the Mi Tierra bakery counter servers are "counter personnel who directly serve customers" at the bakery counter in the waiting area and receive tips from customers.  (*See supra* at 5).  As an example of counter personnel who were properly included in a tip pool, the DOL expanded counter personnel to include itamae-sushi chefs and teppanyaki chefs as "tipped employees under the FLSA" and eligible to participate in tip pools because they "provide customer service similar to counter persons."  DOL Opinion Letter FLSA 2008-18 (December 19, 2008).   The Opinion Letter explains that it has been the DOL's "longstanding position that counter persons who serve customers may participate in tip pools."  *Id.*; *see also* DOL Handbook § 30d04(a) (counter personnel who serve customers is a position specifically identified as eligible to participate in a tip pool).  Because Mi Tierra's bakery counter servers are "counter personnel who serve customers" directly and customarily and regularly receive more than $30 per month in tips from both customers and the tip pool (*see supra* at 5), the bakery counter servers are valid participants in its tip pool as a matter of law, and any claim that their inclusion in the tip pool invalidates the tip pool must be dismissed.

**D.**   **Mi Tierra's Service Bartenders are Properly Included in the Tip Pool.**

**1.  Restaurant patrons are incentivized to customarily and regularly tip for the service bartenders' services.**

In denying Plaintiff's Motion for Summary Judgment, this Court has held that the determination of whether the employee's duties are an "integral part of customer service" and performed in a manner visible to customers such that the customers would be incentivized to

22

"'customarily and regularly' tip 'in recognition' of her services" is central to the larger determination of whether service bartenders are properly included within the tip pool in this case. *Barrera*, 2011 U.S. Dist. LEXIS 83468, at *11. As explained in detail previously, Mi Tierra uses service bars and employs service bartenders for the specific purpose of improving customer service and making sure that drinks are efficiently brought to the tables of customers in the dining rooms. It does not want customers and servers competing for the attention of its bartenders, as Mi Tierra believes that a bartender would likely attend those who are directly tipping (the customers) as opposed to those who are not (the servers). Thus, the servers would have to wait longer for the drinks for the patrons seated at the tables, and customer service would suffer. Mi Tierra's service bartenders specifically focus on preparing drinks for the servers, who then take the drinks directly to the seated patrons.[17] Furthermore, Mi Tierra's service bars are decorative and festive for the sole purpose of enhancing the customer's dining and drinking experience.

It is undisputed that Mi Tierra's service bartenders prepare drinks for servers and not customers so that the servers may effectively and efficiently respond to the seated customers' drink orders[18]. These duties are performed in plain sight of the customers at unique and attractive service bars. MTC believes that this provides better service to customers, who are then incentivized to customarily and regularly tip the service team (of hosts/hostesses, assistant servers/bussers, servers and service bartenders) for the total service and experience provided.

---

[17] Mi Tierra's service bartenders are not akin to salad preparers. The fact that Mi Tierra prefers that its service bartenders not serve customers directly sets them apart from the duties of a salad preparer. *See Myers*, 192 F.3d at 546, 550 (finding that salad preparers were improperly included in the tip pool). As explained in detail, by having service bartenders focus on the servers' drink orders, servers are not competing directly with customers. The salad preparers in *Myers* would never be in direct competition with customers while they prepare salads in the kitchen out of sight from the customers.

[18] Notably, Named Plaintiff Virginia Barrera explains that Mi Tierra's service bartenders are not back-of-the-house employees and admits that her tips from customers could be based in part on the service bartender's performance. (Ex. R at 146–149). She also admits that service bartenders are performing a role that impacts the dining experience for customers. (*Id.* at 147).

**2. Mi Tierra's service bartenders perform substantially similar duties of a barback.**

Previously, this Court recognized that "there seems to be substantial similarity between Mi Tierra's service bartenders and the DOL's definition of barback." *Barrera*, 2011 U.S. Dist. LEXIS 83468, at \*12. The positions of busboy, barback and Mi Tierra's service bartenders "have little direct customer interaction, but seem to perform important customer service functions in a manner that is visible to the customer—meeting the test of this District and its sister courts." *Id.* It is undisputed that Mi Tierra's service bartenders' duties are substantially similar to, if not even more important than (at least, for purposes of serving customers), a barback, which the DOL has considered to be valid for tip-pool inclusion purposes. (*See supra* at 14-15).

Because Mi Tierra has established as a matter of law that its service bartenders, hosts/hostesses, bakery counter servers and assistant servers/bussers are properly included in its tip pool, its Motion for Partial Summary Judgment should be granted as to Plaintiff's claims related to the alleged invalidity of the tip pool and any resultant effect on MTC's obligations to pay Plaintiff the required minimum wage under the FLSA.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully requests that the Court grant this Motion, hold as a matter of law that Mi Tierra's tip pool is valid as to all participants, and grant such other and further relief to which Defendant is justly entitled.

24

Respectfully submitted,

**COX SMITH MATTHEWS INCORPORATED**
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone:   (210) 554-5500
Facsimile:    (210) 226-8395

By:   _/s/ Ramon D. Bissmeyer_
      **Ramon D. Bissmeyer**
      State Bar No. 00787088
      rbissmeyer@coxsmith.com
      **Cora C. McGowan**
      State Bar No. 24060258
      cmcgowan@coxsmith.com

**DAVIS, CEDILLO & MENDOZA, INC.**
McCombs Plaza, Suite 500
755 East Mulberry Avenue
San Antonio, Texas 78212
Telephone: (210) 822-6666
Facsimile: (210) 822-1151
**Ricardo G. Cedillo**
State Bar No. 04043600
rcedillo@lawdcm.com
**Mark W. Kiehne**
State Bar No. 24032627
mkiehne@lawdcm.com

**ATTORNEYS FOR DEFENDANT,
MTC, INC. d/b/a MI TIERRA
CAFÉ AND BAKERY**

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of September, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jeremi K. Young
THE YOUNG LAW FIRM, PC
112 W. 8th Ave., Suite 900-D
Amarillo, Texas 79101
jyoung@youngfirm.com

               _/s/ Ramon D. Bissmeyer_
               Ramon D. Bissmeyer
               Cora C. McGowan
               Attorneys for Defendant

3448528.10